**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**PEERLESS INSURANCE CO.,**

    **Plaintiff,**

**vs.**                 **Case No. 8:06-cv-250-T-27TGW**

**M.A.S.S. SERVICES, INC., et al.,**

    **Defendants.**

_____/

### ORDER

  **BEFORE THE COURT** are: (1) Plaintiff Peerless Insurance Company's Motion for Summary Judgment (Dkt. 50), to which Defendant M.A.S.S. Services, Inc. has responded in opposition (Dkt. 81), joined by Defendants Mary Prokosch and James Prokosch, as personal representative of the estate of Douglas Prokosch (Dkt. 80); and (2) Defendant M.A.S.S. Services, Inc.'s Motion for Summary Judgment (Dkt. 72), to which Peerless Insurance Company has responded in opposition (Dkt. 84). The Court heard oral argument on September 27, 2007. (Dkt. 101). Upon consideration, M.A.S.S. Services Inc.'s motion is GRANTED and Peerless Insurance Company's motion is DENIED.

*Background*

  Plaintiff Peerless Insurance Co. ("Peerless") insured Defendant M.A.S.S. Services, Inc. ("M.A.S.S. Services"), a waste management business, under two separate policies: a Business Automobile Policy (Policy No. BA 9639333) ("Business Auto Policy"); and a Commercial Umbrella Liability Coverage Policy (Policy No. CU 9773696) ("Umbrella Policy"). On June 7, 2005,

1

Defendant's employee, Defendant Carl Croon, was involved in an accident with Defendant Mary Prokosch and decedent Douglas Prokosch.  The accident is the subject of an underlying state court action in Florida.  In its motion for summary judgment, Peerless seeks a declaration that there is no coverage for the accident under the Business Auto Policy and Umbrella Policy.  M.A.S.S. Services contends that the relevant policy language is clear and unambiguous and provides coverage for the accident.

1.    *Business Auto Policy*

This coverage dispute turns, in part, on whether the Symbol 1 "any auto" liability coverage in the Business Auto Policy applies to the vehicle involved in the Florida accident, which at the time was garaged in Florida ("the Florida vehicle").  Peerless maintains that the Business Auto Policy applies only to vehicles licensed or garaged in Georgia, or in the alternative, that it should be voided for fraud or equitably reformed to only apply to Georgia vehicles.

At the time of the Florida accident, it is undisputed that the Business Auto Policy was in effect, having been renewed by Peerless in October 2004, eight months before the accident. In August 2004, BB&T Insurance Services, Inc. ("BB&T"), through its agent Scott Russell, submitted M.A.S.S. Services' application for renewal of the Business Auto Policy to Peerless. (Dkt. 72, Exh. E, Russell Aff. ¶¶ 8-10, Exh. 2).  Peerless had insured M.A.S.S. Services for the preceding two years. (Dkt. 67, Slade Dep. at 94-95).  The application requested "Symbol 1" liability coverage, which provides coverage for "any auto."  Peerless issued the renewal policy in October 2004, including Symbol 1 "any auto" liability coverage.  (Russell Aff. ¶ 15).[1]

On February 17, 2005, Mark Slade, the President of M.A.S.S. Services, advised Carol

---

[1] The Policy includes a $1,000,000 liability limit for each accident or loss.  (Dkt. 50, Exh. A at 27).

Limberg, a sales agent at BB&T, that the company was expanding its operations into Florida and that it would be moving one of its Georgia vehicles to Florida. (Dkt. 72, Exh. C, Slade Aff. ¶ 11; Dkt. 72, Exh. G, Limberg Aff. ¶ 5, Exh. 1). On February 22, 2005, Slade advised Limberg that M.A.S.S. Services would lease a vehicle in Florida rather than move a vehicle to Florida. (Slade Aff. ¶ 11; Limberg Aff. ¶ 6, Exh. 2). That same day, Limberg informed Starr Hutcheson at Peerless that M.A.S.S. Services would be leasing a vehicle that would be garaged in Florida. (Limberg Aff. ¶ 7). Hutcheson told her that Peerless did not have filings in Florida and that M.A.S.S. Services should purchase a policy with a different company to cover the vehicle. (*Id.*) This conversation was confirmed by Hutcheson's February 22, 2005 email:

> Per our conversation, I am unable to offer coverage for our insured's Florida vehicle as Montgomery[2] does not have filings[3] in the state of Florida. WE [*sic*] have two options to consider:
> Secure coverage with another carrier.
> Obtain a quote for coverage thru Liberty Mutual Business Solutions Group. . . .
> With either option, we will need to amend our liability symbol to 7, so as not to pick up the vehicles on both policies. (Limberg Aff., Exh. 3).

On February 23, 2005, BB&T bound coverage for the vehicle with Auto-Owners Insurance Company. (Slade Aff. ¶ 11-12; Limberg Aff. ¶ 10).

On March 31, 2005, Hutcheson sent the following email to Limberg confirming an earlier conversation:

> Per our conversation this morning, you advised that our insured did not purchase a vehicle located in Florida, therefore we do not have to worry about the out of state exposure. If this should change, please let me know as soon as possible because

---

[2] Peerless is one of Montgomery's underwriting companies, and the names are used interchangeably by the parties. (Dkt. 72, Exh. D, Hutcheson Dep. at 8). For clarity, "Peerless" is used throughout this Order.

[3] To have filings in a state, the insurance carrier must "file their rates, rules, forms with the Department of Insurance and get approval from the Department of Insurance to write business in that state." (Dkt. 72, Exh. L, Zink Dep. at 113-14). It is undisputed that Peerless did not have filings in Florida.

Montgomery does not currently have filings in the state of Florida.  (Dkt. 50, Exh. P).

Limberg avers that she and Hutcheson discussed only whether M.A.S.S. Services moved one of its Georgia vehicles to Florida, which it had not.  Although the email referred to a "purchase," Limberg avers that she interpreted the email to mean that M.A.S.S. Services did not move one of its Georgia vehicles to Florida, and that in any event, no vehicle had been purchased at that time.  (Limberg Aff. ¶ 21-22).

M.A.S.S. Services acquired the vehicle involved in the accident several days later, on April 8, 2005.  (Slade Aff. ¶ 14).  Slade notified Limberg of this acquisition.  (*Id.*; Limberg Aff. ¶ 4, Exh. 1, 2).  It does not appear from the record evidence that Limberg notified Peerless of the vehicle's acquisition.[4]  This vehicle was the one involved in the Florida accident on June 7, 2005.

*2.  Umbrella Policy*

Peerless also renewed M.A.S.S. Services' Umbrella Policy in October 2004.  (Dkt. 50, Exh. B).  The Umbrella Policy provides that Peerless will pay "those sums in excess of the Retained Limit that the insured becomes legally obligated to pay as damages . . . ."  (Sec. I, A, 1).  The Retained Limit is "[t]he total amount of Underlying Insurance applicable to the injury or damage."  (Sec. V,Q).[5]

Peerless contends that the Umbrella Policy does not provide coverage because there is no "scheduled underlying insurance" triggering coverage under the Umbrella Policy.  Specifically,

---

[4] An April 20, 2005 email from Limberg to Hutcheson states: "Insured has purchased some equipment which will be used in Florida.  He is preparing to open up down there.  Can we add the equipment to the existing equipment floater?"  (Limberg Aff., Exh. 5).  It appears from a subsequent email that this reference to equipment relates to portolets and handwash stations, not to the Florida vehicle.  (*Id.*).

[5] The Umbrella Policy provides an "Each Occurrence" limit of $5,000,000.  (Dkt. 50, Exh. B. at 25).

Peerless argues that the Business Auto Policy does not constitute scheduled underlying insurance because it does not cover the Florida vehicle. Peerless also argues that the Auto-Owners Policy purchased by M.A.S.S. Services does not constitute "scheduled underlying insurance" because it was never added to the Schedule of Underlying Insurance.

On February 23, 2005, Limberg faxed an "Accord Commercial Policy Change Request" form to Peerless, requesting that the Auto Owners Policy be listed as underlying insurance on Peerless's Umbrella Policy. (Limberg Aff. ¶ 10, Exh. 4). Limberg sent a second copy of the "Accord Commercial Policy Change Request" form to Peerless on May 26, 2005. (Limberg Aff. ¶¶ 26-29, Exhs. 6). Peerless took no action on either of the Umbrella Policy change requests until June 26, 2005, after the June 7, 2005 accident. (Limberg Aff. ¶ 27).

In this action, Peerless: (1) seeks a declaration that the policies apply only to vehicles garaged in Georgia (Count I); (2) requests that the Business Auto Policy be equitably reformed because it was not the intent of the parties for the Policy to apply to vehicles outside Georgia (Count II); and (3) claims that M.A.S.S. Services breached the Policy when Limberg fraudulently concealed that M.A.S.S. Services had acquired Florida vehicles or misrepresented that M.A.S.S. Services did not have vehicles in Florida (Count III). Finally, Peerless seeks a declaration that neither the Business Auto Policy nor the Auto Owners Policy constitute scheduled underlying insurance to the Umbrella Policy (Count IV).

M.A.S.S. Services contends that the plain language of the Business Auto Policy covers "any auto," including the Florida vehicle, that both parties intended to contract for Symbol 1 "any auto" coverage and therefore there was no mutual mistake, and that Limberg did not conceal or misrepresent any facts to Peerless. Further, M.A.S.S. Services contends that both the Business Auto

5

Policy and the Auto-Owners Policy constitute underlying insurance under the Umbrella Policy, as the Business Auto Policy's Symbol 1 "any auto" liability coverage applies to the Florida vehicle and the Policy does not require that the Auto-Owners Policy be added to the Schedule of Underlying Insurance.  For the reasons discussed below, this Court finds that M.A.S.S. Services is entitled to summary judgment on all claims.

### Standard

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56.  "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case."  *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004).  "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  *Id.* at 1260.  All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial.  *Celotex*, 477 U.S. at 323-24.  Peerless's evidence must be significantly probative to support the claims.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact.  *Anderson*, 477 U.S. at 249;

*Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003).  Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party.  *Id.*

### Discussion

#### A.    Governing Law

A federal district court sitting in diversity jurisdiction is required to apply the conflict of laws rules of the forum state.  *Shaps v. Provident Life and Acc. Ins. Co.*, 317 F.3d 1326, 1329 (11th Cir. 2003).  "Under Florida's conflict-of-law rules, [t]he doctrine of *lex loci contractus* directs that, in the absence of a contractual provision specifying governing law, a contract [other than one for performance of services] is governed by law of the state in which the contract is made. . . ." *Id.* at 1329-30.  The contracts for insurance were entered into in Georgia (Dkt. 1, ¶ 13), and the parties do not dispute that Georgia law governs the interpretation and application of the policies.

Under Georgia law, insurance policies "are interpreted by ordinary rules of contract construction." *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.,* 498 S.E.2d 492, 494 (1998).  An insurance contract is to be construed in accord with the intent of the parties. *Ryan v. State Farm Mut. Auto. Ins. Co.,* 413 S.E.2d 705, 707 (1992); Ga. Code. Ann. § 13-2-3.  If the contract is clear and unambiguous, the court looks only to "the ordinary and legal meaning of the words employed in the insurance contract" in order to ascertain the parties' intent.  *Ryan,* 413 S.E.2d at 707; *Race, Inc. v. Wade Leasing, Inc.*, 411 S.E.2d 56, 57 (Ga. App. 1991).  "The contract is to be considered as a whole and each provision is to be given effect and interpreted so as to harmonize with the others." *Boardman Petroleum, Inc.*, 498 S.E.2d at 494.  If a contract term is ambiguous, however, "the policy should be construed in favor of the insured and to provide maximum coverage." *Ryan,* 413 S.E.2d at 707.

### B.   Business Auto Policy

*1.   Policy Language*

The plain language of the Business Auto Policy is unambiguous and therefore governs the instant coverage dispute.  Because the Business Auto Coverage Form provides broad Symbol 1 coverage for "any auto" for accidents or losses occurring anywhere within the United States, the Florida vehicle is covered.

The Business Auto Coverage Form provides:

**Section II - Liability Coverage**

**A.   Coverage**

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto."

Section I of the Business Auto Coverage Form defines which autos are "covered autos":

**Section I - Covered Autos**

Item Two of the Declarations shows the "autos" that are covered "autos" for each of your coverages.  The following numerical symbols describe the "autos" that may be covered "autos".  The symbols entered next to a coverage on the Declarations designate the only "autos" that are covered "autos".

Item Two of the Declarations, in turn, specifies the following coverages and numerical symbols:

| Coverages | Covered Autos |
| --- | --- |
| Liability | 1 |
| Auto Medical Payments | 2 |
| Uninsured Motorists | 2 |
| Physical Damage Comprehensive Coverage | 7, 8 |

8

Physical Damage                    7, 8
Collision Coverage

The relevant numerical symbols are defined as follows:

| Symbol | | Description of Covered Auto Designation Symbols |
|--------|--|------------------------------------------------|
| 1 | Any "Auto" | |
| 2 | Owned "Autos" Only | Only those "autos" you own . . . .This includes those "autos" you acquire ownership of after the policy begins. |
| . . . | | |
| 7 | Specifically Described "Autos" | Only those "autos" described in Item Three of the Declarations for which a premium charge is shown. |
| 8 | Hired "Autos" | Only those "autos" you lease, hire, rent or borrow. |

The plain language of the Business Auto Coverage Form provides Symbol 1 "Liability" coverage for "any auto."   In addition, Section IV provides that "accidents" and "losses" within the "coverage territory" are covered.  The coverage territory includes "The United States of America." (Sec. IV, 7).  The Business Auto Policy therefore provides coverage for "any auto" for accidents and losses occurring in "[t]he United States of America."

Based on these unambiguous provisions, liability coverage is provided for any auto operated by M.A.S.S. Services, without regard to its geographic location in the United States.   (*See also* Posner Dep. at 32, 58[6]). This conclusion is confirmed by reviewing the Policy as a whole.  All other coverage symbols include various restrictions on coverage, while Symbol 1 has no restriction. The record evidence indicates that Peerless also read Symbol 1's "any auto" coverage broadly, as demonstrated by Hutcheson's February 23, 2005 email, which expressly noted that the Symbol 1

---

[6] "Symbol One is Symbol One. It says any auto.  I think a fair reading of it is that it's really on any auto."

9

"any auto" coverage would have to be changed to the more restrictive Symbol 7 so as not to "pick up" the Florida vehicle. (Limberg Aff., Exh. 3).

In addition, "[e]ven going beyond the clear language of the policy to consider the substantial purpose behind the [provision], the conclusion is the same." *Park 'N Go of Ga., Inc.*, 471 S.E.2d at 503. Symbol 1 "any auto" coverage is the broadest commercial auto coverage and "offers automatic coverage to vehicles the named insured acquires after the policy begins without having to first report the vehicle to the insurance company." *Mossman v. Transamerica Ins. Co.*, 816 F. Supp. 633, 637 (D. Hawaii 1993).

> This type of liability coverage is referred to as "fleet automatic coverage," and according to its terms did not require Container to inform Home of newly acquired vehicles. Instead, pursuant to the regular business practice that existed between Container and Home, Home would determine the policy premiums Container owed by a year-end audit of Container's vehicles. This audit would determine which vehicles had been newly acquired during the policy period. *Cont'l Ins. Co. v. Home Indem. Co.*, No. 4-85-1151, 1986 WL 15156, *2 (D. Minn. Dec. 17, 1986).

Similarly, the Business Auto Coverage Form does not require M.A.S.S. Services to notify Peerless of newly acquired vehicles, instead providing for an annual premium audit in Section IV, B, 6. (Posner Dep. at 29; Slade Dep. at 32).[7]

To the extent Peerless offers parol evidence that the insurance industry understanding is that "any auto" applies only to autos in states in which the insurer maintains filings, that reliance is misguided because the Policy language is clear and unambiguous. *Ben Farmer Realty, Inc. v. Owens*, No. 07-807, -- S.E.2d --, 2007 WL 1933588, *2 (Ga .App. July 5, 2007) ("a custom may not

---

[7] Specifically, the Policy provides in Section II, B: "If Symbols 1, 2, 3, 4, 5, or 6 are entered next to a coverage in Item Two of the Declarations then you have coverage for 'autos' that you acquire of the type described for the remainder of the policy period." By contrast, the Policy provides that under Symbol 7 coverage, the insured must "tell us within 30 days after you acquire [a vehicle] that you want us to cover it for that coverage." Peerless's reliance on *Wilder v. Jefferson Ins. Co. of N.Y.*, 555 S.E.2d 771 (Ga. App. 2001) is misplaced. *Wilder* involved Symbol 7 auto coverage, which required an insured to notify the insurer of new vehicles. *See id*. at 567.

be shown to be a part of an unambiguous contract when the custom is inconsistent with or contrary to the express or necessarily implied terms of the contract"); *see also* Ga. Code. Ann. § 13-2-2(3) (custom of any business is binding "only when it is of such universal practice as to justify the conclusion that it became, by implication, a part of the contract"). The restriction urged by Peerless is not contained in the Policy, (Posner Dep. at 41; Casagrande Dep. at 28-29), and cannot be read into the unambiguous terms of the Policy. Because the accident occurred in Florida, it is within the coverage territory, as expressly defined in the Policy.

Peerless does not directly address the coverage provisions described above. Instead, Peerless contends that the Policy restricts coverage to Georgia vehicles based on language contained in the "Georgia Changes" Endorsement. This endorsement provides in relevant part:

> For a covered "auto" licensed or principally garaged in Georgia, this endorsement modifies insurance provided under the following:
>
> Business Coverage Form
> . . .
>
> With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

Insurance policies are properly construed in their entirety, "as amplified, extended, or modified by any rider, endorsement, or application made a part of the policy." Ga. Code Ann. § 33-24-16. By its express language, however, the Georgia Changes Endorsement does not restrict the liability coverage of the Business Auto Coverage Form. Rather, it specifies several changes to coverage *for those autos that are licensed or principally garaged in Georgia*. The coverage for any autos that are not licensed or principally garaged in Georgia remains governed by the general provisions of the Business Coverage Form. Indeed, Peerless's expert, Jeffrey Posner, testified that the Georgia Changes endorsement does not limit coverage to Georgia vehicles. (Dkt. 72, Exh. J, Posner Dep. at 110-12).

11

Peerless also argues that coverage is limited to Georgia vehicles by virtue of the "Schedule of Covered Autos" in Item Three of the Declarations of the Business Auto Policy. Item Three lists eighteen vehicles, each of which is described as principally garaged in "Forsyth County, Georgia." Contrary to Peerless' contention, that listing of Georgia vehicles plainly and unambiguously relates to the Policy's Symbol 7 physical damage coverage, which is not at issue in this dispute. Symbol 7 coverage is described as covering "[o]nly those 'autos' described in Item Three of the Declarations for which a premium charge is shown." (emphasis added). By contrast, M.A.S.S. Services' liability coverage was for Symbol 1 "any auto," which does not limit coverage to those vehicles in Item Three, or in any other respect. This distinction between Symbol 1 and Symbol 7 coverage further evidences the unrestricted nature of Symbol 1 "any auto" coverage.

Peerless also premises its argument on evidence regarding the parties' intent (*See e.g*, Dkt. 50 at 3, 6-12, 19-20), noting, for instance, that Slade testified that he never purchases duplicate insurance coverage (Slade Dep. at 25). Peerless' reliance on the intent of the parties is misguided. Where, as here, the Policy language is unambiguous, the interpretation of the Policy is governed by its plain language, not the parties' intent.[8]  *Park 'N Go of Ga., Inc. v. U.S. Fidelity and Guar. Co.*, 471 S.E.2d 500, 503 (Ga. 1996).

Finally, Peerless claims that BB&T was not authorized by Peerless to bind coverage for the

---

[8] As noted by the Eleventh Circuit, there has been some past conflict among Georgia courts as to whether contract interpretation is governed by the parties' intent or the plain language of the contract. *See U.S. Fidelity & Guar. Co. v. Park 'N Go of Ga., Inc.*, 66 F.3d 273, 278 (11th Cir. 1995). However, in answering the certified question presented to it by the Eleventh Circuit in *Park N'Go*, the Georgia Supreme Court confirmed the applicability of the principles of contract interpretation set forth above: "when the terms of a written contract are clear and unambiguous, the court is to look to the contract alone to find the parties' intent." *Park 'N Go of Ga., Inc. v. U.S. Fidelity and Guar. Co.*, 471 S.E.2d 500, 503 (Ga. 1996). The single case relating to contract interpretation cited by Peerless in its motion for summary judgment also recites this principle. *N. Metro Directories Publ'g, LLC v. Cotton States Mut. Ins. Co.*, 631 S.E.2d 726, 729 (Ga. App. 2006) ("When the policy terms are clear and unambiguous, we look to the contract alone to determine that intent.").

Florida vehicle. A document entitled "Montgomery Insurance Companies Agents Binding Authority Memorandum" provides: "The following exposures may not be bound under any circumstances: . . . Any property or dwelling located outside of the state of domicile or your Agency" (Dkt. 50, Exh. D, at 000439).[9]  Peerless apparently contends that this provision means that BB&T was not authorized to bind the Florida vehicle.[10]  However, BB&T's binding authority is not a material issue because Peerless had renewed the Policy, effective October 1, 2004, approximately six months before the Florida vehicle was acquired.[11]  As George Zink testified in his deposition:

> Q: My understanding was the binding coverage and issuing coverage were two separate things; is that incorrect?
> A: No, that's right.
> Q: So as of October 1st, 2004, was anyone binding coverage for M.A.S.S. under these two policies?
> A. No. I don't think anyone was binding coverage. Coverage continued, because it was a renewal policy. (Zink Dep. at 62-63).

The renewal of the Policy in October 2004, including Symbol 1 "any auto" liability coverage, "superseded any temporary binder of coverage." *Green v. Progressive Ins. Co.*, 397 S.E.2d 20, 21 (Ga. App. 1990); *see generally* Ga. Code Ann. § 33-24-33. There is no evidence that any subsequent binder was issued.  In contrast to other cases in which the binding authority of the agent was at issue, the Business Auto Policy in this case was already in effect and provided coverage for the Florida vehicle. BB&T's binding authority is therefore irrelevant. Simply stated, the Policy had

---

[9] Because nothing in the Binding Authority Memorandum indicates that it was received or agreed to by BB&T, there is an issue of fact as to whether BB&T was bound by the Memorandum's provisions.

[10]  Although Peerless has contended that it was not permitted to cover vehicles in states in which it did not have filings, Peerless has not claimed that the Policy's provisions are illegal or contrary to public policy, and the Court accordingly does not address such an argument.

[11] The Court construes "binding authority" to refer to the insurance industry concept of an insurance agent's ability to temporarily "bind" coverage, which occurs prior to the insurer's issuance of a policy. *See* Ga. Code Ann. § 13-2-2(2) (words of art will be construed with reference to that meaning).

been renewed eight months before the accident, was in effect when the accident occurred, and there is accordingly no issue of a temporary binder.

The plain language of the Business Auto Coverage Form broadly defines "covered auto" as "any auto" for liability coverage purposes. *Pac. Employers Ins. Co. v. Domino's Pizza, Inc.*, 144 F.3d 1270, 1275 (9th Cir. 1998). Peerless is essentially attempting to graft an exclusion onto the Policy for vehicles outside Georgia. It is undisputed that the Policy contains no such exclusion. It was Peerless's responsibility to include exclusions from coverage in the Policy. "[T]he insurer, having affirmatively expressed coverage in broad promissory terms, has a duty to define any limitations or exclusions clearly and explicitly." *MAG Mut. Ins. Co. v. Gatewood*, 367 S.E.2d 63, 67 (Ga. App. 1988). The Policy contains no exclusions with respect to vehicles licensed or garaged in Florida or, for that matter, vehicles licensed or garaged outside of Georgia. The Florida vehicle is therefore a covered auto.

In summary, the plain language of the Policy covered "any auto," for accidents and losses occurring anywhere "in the United States of America." No exclusion for vehicles operated or garaged outside Georgia was included in the Policy. Accordingly, M.A.S.S. Services's motion for summary judgment is granted as to Count I, and Peerless's motion for summary judgment is denied as to Count I.

2.    *Reformation*

In Count II, Peerless seeks equitable reformation of the Business Auto Policy, alleging that neither party intended for the policy to cover Florida vehicles because at the time of renewal, M.A.S.S. Services operated only in Georgia. (Dkt. 1, ¶ 44). Under Georgia law, equity may be used to reform a contract "where by mistake of the scrivener and by oversight of the parties, the writing

does not embody or fully express the real contract of the parties." *Curry v. Curry*, 473 S.E.2d 760, 761 (Ga. 1996). The mistake must be common to both parties. *Id*.; Ga. Code. §§ 23-2-30; 23-2-31.

The requirement for a mutual mistake necessitates:

> a mistake shared by, or participated in by, both parties, or a mistake common to both parties, or reciprocal to both parties; both must have labored under the same misconception in respect of the terms and conditions of a written instrument, intending *at the time of the execution of the instrument* to say one thing and by mistake expressing another, so that the instrument as written does not express the contract or intent of either of the parties. *Yeazel v. Burger King Corp.*, 526 S.E.2d 112, 116 (Ga. App. 1999) (quoting *Hartford Accident &c. Co. v. Walka Mountain Camp & Co.,* 160 S.E.2d 833 (Ga. 1968)) (emphasis added).

Peerless argues that Slade intended the Business Auto Policy to cover only Georgia vehicles and that there was accordingly a "mutual mistake" at the time the policy was issued in October 2004. (Dkt. 84 at 6). The record does not support Peerless's contention. As discussed below, M.A.S.S. Services applied for Symbol 1 "any auto" coverage and Peerless issued the Policy including Symbol 1 "any auto" coverage. There was no misconception with respect to the terms and conditions of the Policy. The parties did not attempt to say one thing and by mistake say something else. There was no mutual mistake.

Slade avers that he intended to purchase Symbol 1 "any auto" coverage, which as discussed, covers the Florida vehicle. (Slade Aff. ¶ 8). Peerless, however, points to Slade's deposition testimony:

> Q:   Was the intent when you purchased the policy to cover vehicles in Florida?
> A:   Initially, no.
> Q:   And we'll discuss more of this later, but initially you didn't even have any vehicles in Florida; correct?
> A:   Correct.
> Q:   Was there -- in October 2004 then, was there an intent in the future to broaden the business to where you would open up a business in Florida?
> A:   Yes.
> Q:   Okay. And did you convey that to BB&T in October of 2004?

15

A:      No.
(Slade Dep. at 15).

Peerless does not address its own intent at the time of the renewal in October 2004.  As M.A.S.S. Services points out, Peerless' Branch Manager, George Zink, testified that Peerless intentionally renewed the policy in October with Symbol 1 coverage, not in error or by mistake. (Dkt. 72, Exh. L, Zink Dep. at 71).   On the other hand, although not cited to by Peerless, Zink, Hutcheson and another underwriter, Sharon Cassagrande, each testified that they understood Symbol 1 "any auto" coverage to apply only to autos in states in which Peerless has filings.  (Zink Dep. at 67-69; Casagrande Dep. at 27; Hutcheson Dep. at 75).   There is no evidence that Slade, on behalf of M.A.S.S. Services, understood this to be the case.

"[E]vidence of a mutual mistake must be clear, unequivocal and decisive." *Am. Manuf. Mut. Ins. Co. v. E A Tech. Servs., Inc.*, 608 S.E.2d 275, 278 (Ga. App. 2004) (finding mutual mistake based on scrivener's error).   There is no mutual mistake here.  The evidence of record indicates that Peerless may have mistakenly believed that Symbol 1 "any auto" coverage applied only to vehicles in states in which Peerless had filings.[12]   However, there is no evidence that Slade, at the time the contract was entered into, mistakenly believed coverage was limited to vehicles in states in which Peerless had filings.  Accordingly, there was no mutual mistake, as both parties to the contract did not labor "under the same misconception."[13] *Yeazel*, 526 S.E.2d at 116; *see also* Ga. Code. Ann. §

---

[12] Of course, Hutcheson submitted contradictory testimony on this point when questioned why, if she thought the policy only applied to Georgia vehicles, she wrote the February 22, 2005 email about changing coverage from Symbol 1 to Symbol 7 so as not to "pick up" the Florida vehicle.  (Hutcheson Dep. at 81-82).

[13] Nor does Slade's deposition testimony indicate that he believed coverage was limited to vehicles in Georgia.  Rather, he just happened to renew coverage at a time when he only had vehicles in Georgia.  In any event, such a "mistake" on Slade's part, if any, would not possess the required mutuality because Peerless apparently believed that Symbol 1 coverage applied to vehicles in states in which Peerless had filings, not that Symbol 1 applied only to Georgia vehicles.

13-2-4 ("[T]he meaning placed on the contract by one party *and known to be thus understood by the other party* at the time shall be held as the true meaning.") (emphasis added).  To find otherwise would allow an insurer such as Peerless to reform an insurance policy simply because of its failure to comprehend the terms of its own policy or to anticipate the extent of coverage.  If there was any mistake, it was a unilateral mistake of law by Peerless.

Although Peerless does not claim unilateral mistake as a basis for reformation, for the sake of completeness, the Court will evaluate the application of this theory to the material facts.  Equitable reformation may be used to reform a contract based on "the unilateral mistake of one party accompanied by fraud or inequitable conduct on behalf of the other party." *Layfield v. Sanford*, 274 S.E.2d 450, 451 (Ga. 1981). "[R]elief may be granted even in cases of negligence by the complainant if it appears that the other party has not been prejudiced thereby." *Cotton States Mut. Ins. Co. v. Woodruff*, 451 S.E.2d 106, 107 (Ga. App. 1995); Ga. Code. Ann. § 23-2-32.  In *Cotton States*, the purported insured, Woodruff, was involved in an accident with a vehicle he had removed from his policy.  At 12:20a.m. on May 6, 1993, the vehicle collided with a bicyclist.  Later that day, Woodruff called the insurance company and asked that the vehicle be added to the policy, although he did not disclose the earlier accident.  As a matter of practice, Cotton States bound coverage to 12:01a.m. on that day.  After Woodruff notified it of the accident, Cotton States filed a claim for equitable reformation. The trial court denied its motion for summary judgment. The Court of Appeals reversed, finding that the insured had inequitably withheld information about the accident, and that: "[i]t is also clear that Woodruff 'rather than being prejudiced by the negligence of [Cotton States] stands, in fact, to obtain a windfall [insurance coverage] not bargained for absent the equitable remedy of reformation." *Cotton States Mut. Ins. Co.*, 451 S.E.2d at 108.

In this case, Peerless has not alleged any inequitable conduct on the part of Slade, M.A.S.S.

Services, or BB&T at the time the Policy was renewed in October 2004.  Although Slade did not

divulge the possibility of M.A.S.S. Services' future expansion into Florida, there is no allegation that

any such information was requested, that he was under a duty to share that possibility with Peerless,

or that M.A.S.S. Services had, in fact, expanded into Florida at that time.  In contrast to *Woodruff*,

in which the insured withheld information regarding an accident that had already occurred, Slade did

not withhold information regarding ownership of a Florida vehicle, as M.A.S.S. Services is not

alleged to have owned any Florida vehicle in 2004, when the Policy was renewed.  The Court

therefore finds that there was no "fraud or inequitable conduct" justifying reformation.[14]

The remedy of reformation "*is not available for the purpose of making a new and different*

*contract for the parties*, but is confined to establishment of the actual agreement." *Cotton States Mut.*

*Ins. Co.*, 451 S.E.2d at 107 (emphasis added).  The first page of M.A.S.S. Service's application for

renewal coverage requested Symbol 1 "any auto" coverage.  (Russell Aff. ¶¶ 10-13, Exh. 2).

Peerless issued Symbol 1 "any auto" renewal coverage in October 2004.  (Russell Aff. ¶ 15-16).

Slade avers that he intended to purchase Symbol 1 "any auto" coverage. (Slade Aff. ¶ 8). As noted,

Peerless' Branch Manager, George Zink, expressly testified that Peerless intentionally renewed the

policy in October with Symbol 1 "any auto" coverage, not in error or by mistake.  (Zink Dep. at 71).

Consequently, any equitable reformation in this case would simply protect Peerless from its failure

---

[14] Peerless also argued at the hearing that M.A.S.S. Services paid premiums calculated based on its ownership of only Georgia vehicles.  As discussed in the first section, however, Peerless issued the broadest coverage available and it was Peerless's responsibility to ensure that it charged an appropriate premium for Symbol 1 "any auto" coverage.  *See also B. L. Ivey Const. Co. v. Pilot Fire & Cas. Co.*, 295 F. Supp. 840, 845 (N.D. Ga. 1968) (reformation not justified on basis of amount of premiums because insureds had no reason to know on what basis their premiums were computed).

to include the relevant exclusion or endorsement specifying its alleged understanding that the Policy covered only vehicles in states in which Peerless had filings.  Peerless had a "duty to define any limitations or exclusions clearly and explicitly," which it simply failed to do.  *MAG Mut. Ins. Co.*, 367 S.E.2d at 67-68 (Ga. App. 1988) (reformation was precluded where insurer wrote and reviewed policy and failed to discover its alleged mistake).

M.A.S.S. Services has affirmatively cited to record evidence indicating that Peerless cannot prove its reformation claim by a preponderance of the evidence.  Peerless has not met its burden on its motion for summary judgment, or in response, to show the existence of a mutual mistake or a unilateral mistake due to inequitable or fraudulent conduct on the part of Slade, M.A.S.S. Services, or BB&T.  Based on the foregoing, M.A.S.S. Services's motion for summary judgment is granted as to Count II, and Peerless's motion is denied as to Count II.

*3.      Fraud*

In Count III, Peerless alleges that M.A.S.S. Services breached the "Concealment, Misrepresentation or Fraud" provision of the Business Auto Policy.[15]  (Dkt. 1, ¶¶ 48-53).  Section IV of the Business Auto Coverage Form provides :

> This Coverage Form is void in any case of fraud by you at any time as it relates to this Coverage Form.  It is also void if *you* or any other *"insured"*, at any time, intentionally conceal or misrepresent a material fact concerning:
>
> a.  This Coverage Form;
>
> b.  The covered "auto";

---

[15] Although Peerless relies on both this provision and a similar provision in the Georgia endorsement (Dkt. 1, ¶ 50), the language of the endorsement is inapplicable because the vehicle at issue was not licensed or principally garaged in Georgia.  Peerless's claim is a breach of contract claim.  (Dkt. 1, ¶¶ 47-53).  Peerless does not bring a claim for fraudulent inducement to enter into the contract pursuant to Ga. Code. Ann. § 13-5-5.

c.  Your interest in the covered "auto"; or

d.  A claim under this Coverage Form.
(emphasis added).

Peerless does not contend that Slade, M.A.S.S. Services, or any of its employees concealed anything or made any misrepresentations to it.  Indeed, Slade never communicated directly to Peerless.  (Slade Dep. at 77).  Rather, Peerless contends that Limberg was at fault.  Accordingly, an initial question is whether M.A.S.S. Services may be held responsible for the acts or omissions of Limberg pursuant to the "Concealment, Misrepresentation or Fraud" clause.  Neither party expressly addresses this issue in their briefs.

According to the plain language of the Policy, the "Concealment, Misrepresentation or Fraud" clause applies to fraud, misrepresentation or concealment by "you" or an other "insured."  The Policy defines "you" as "the Named Insured shown in the Declarations."  (Dkt. 50, Exh. A at 39).  The Declarations list five Named Insureds: M.A.S.S. Services Inc. d/b/a Comfort Zone; M.A.S.S. Services Inc. d/b/a Rooter Man; MASS Properties South Fulton LLC; and MASS Properties South Forsyth LLC; and MASS Properties Blue Ridge GA.  (Exh. A at 25).  The Policy defines "insured" as "any person or organization qualifying as an insured in the Who Is An Insured provision of the applicable coverage."  (Sec. V, G).  The "Who Is An Insured" provision in Section II.A.1. includes:

a. You for any covered "auto".
b. Anyone else while using with your permission a covered "auto" you own, hire or borrow . . . [enumerating exceptions]
c.  Anyone liable for the conduct of an "insured" described above but only to the extent of that liability.

Limberg is not "an insured" under the Policy.  Because Limberg does not fall under the "Who

20

Is An Insured" provision and is also not a "Named Insured," Peerless has failed to show, pursuant

to the unambiguous language of the "Concealment, Misrepresentation or Fraud" clause, that it

applies to any alleged fraud, misrepresentation, or concealment by Limberg. *See Dickert v. Allstate*

*Ins. Co.*, 175 S.E.2d 98, 99-100 (Ga. App. 1970) (policy did not cover independent contractor as

insured). Indeed, Peerless has cited no case in which a similar "Concealment, Misrepresentation or

Fraud" clause has been applied to conduct by an insurance agent. On the contrary, Georgia courts

routinely hold, under agency principles, that insurance contracts will not be voided where the insured

discloses relevant information to a soliciting agent during the application process or to a dual agent,

because the agent's knowledge is imputed to the insurer.[16]

Although the foregoing agency principles are, perhaps, helpful in giving context to this

analysis, the Court finds that the specific language of the Policy controls, rather than principles of

agency law. *Stanley Gudyka Sales Co., Inc. v. Lacy Forest Products Co.*, 915 F.2d 273, 276-77 (7th

Cir. 1990) ("We do not disagree with Defendant's discussion of agency law, however, we do disagree

with Defendant that the terms of the contract may be avoided based on agency principles."). Had

Peerless wished to include insurance agents or independent contractors among the enumerated

persons in the "Concealment, Misrepresentation or Fraud" clause, it surely could have done so. *See*

---

[16] *See e.g., Kilgore v. S. Gen. Ins. Co.*, 436 S.E.2d 547, 549 (Ga. App. 1993) (citing *Home Materials, Inc. v. Auto Owners Ins. Co.*, 300 S.E.2d 139, 143 (Ga. 1983) (insurer is estopped from denying coverage when misrepresentations are made by a dual agent and the action is in contract); *Stillson v. Prudential Ins. Co. of Am.*, 42 S.E.2d 121, 124 (1947) (insurer estopped from denying policy where soliciting agent filling out application made false or fraudulent statements); *Patriot Gen. Ins. Co. v. Millis*, 506 S.E.2d 145,147 (Ga. App. 1998) (where independent agent has knowledge of facts, "the insurer may not deny coverage based on a fact not known to it but known to its agent"); *Great Am. Ins. Co., N.Y. v. Walton*, 114 S.E.2d 281, 282-83 (Ga. App. 1960) (insured did not violate concealment or misrepresentation clause because insured disclosed information to insurer's agent).

The Court notes that Peerless has alleged that Limberg was a dual agent. (Dkt. 50 at 21). M.A.S.S. Services has not directly disputed this, contending only that Peerless was an independent agent. (Dkt. 72 at 6 n.9). To the extent there are questions of fact regarding dual agency, *see.e.g, Bowen Tree Surgeons, Inc. v. Canal Indem. Co.*, 591 S.E.2d 415, 417 (Ga. App. 2003), these facts are not material, because the Court determines that agency principles do not govern over the plain language of the Policy.

*e.g.*, *Myers v. Fidelity & Cas. Co. of N.Y.*, 759 F.2d 1542, 1546 n. 6 (11th Cir. 1985) (flood policy specified it would be void if the "assured" or "his agent" concealed or misrepresented any facts). There is no allegation that Slade or any other employee of M.A.S.S. Services engaged in fraud, misrepresentation, or concealment. Accordingly, summary judgment is granted on Count III in favor of M.A.S.S. Services.

Even assuming, for the purposes of this discussion, that M.A.S.S. Services may be responsible for a breach of the "Concealment, Misrepresentation or Fraud" clause based on the actions of Limberg, there is no evidence that Limberg acted with the requisite intent. The plain language of the "Concealment, Misrepresentation or Fraud" clause allows the insurer to void a policy when the insured engages in fraud or "intentionally" conceals or misrepresents material facts. Although the parties have cited no Georgia case on point, other courts addressing the same "Concealment, Misrepresentation or Fraud" clause have uniformly evaluated the insured's intent as a requisite component. *Perspolis, Inc. v. Federated Mut. Ins. Co.*, No. 03-cv-2456, 2006 WL 826469, *2 (N.D. Ga. Mar. 28, 2006); *Tri-State Ins. Co. of Minn. v. H.D.W. Enters., Inc.*, 180 F. Supp. 2d 1203, 1217 (D. Kan. 2001); *Garvey v. Nat'l Grange Mut. Ins. Co.*, No. 95-0019, 1996 WL 220909 (E.D. Pa. Apr. 30, 1996); *Farmers Ins. Exchange v. Neal*, 120 S.W.3d 493, 497-98 (Tex. App. 2003); *cf. Gen. Cas. Ins. Co. v. Holst Radiator Co.*, 88 F.3d 670, 671-72 (8th Cir. 1996) (noting that "fraud" in the insurance contract is not the same as common law fraud, which includes detrimental reliance).

As discussed, the alleged concealment or misrepresentation took place during a March 31, 2005 telephone conversation between Limberg and Hutcheson, as memorialized by Hutcheson's email:

Per our conversation this morning, you advised that our insured did not purchase a vehicle located in Florida, therefore we do not have to worry about the out of state exposure.  If this should change, please let me know as soon as possible because Montgomery does not currently have filings in the state of Florida.  (Dkt. 50, Exh. P).

It does not appear from the record that Limberg notified Peerless when M.A.S.S. Services acquired the Florida vehicle on April 8, 2005.

Nonetheless, Peerless does not provide any evidence that Limberg acted with the requisite intent.  Limberg avers that she and Hutcheson discussed only whether M.A.S.S. Services moved one of its Georgia vehicles to Florida, and that she interpreted the email to mean that M.A.S.S. Services did not move one of its Georgia vehicles to Florida.  Limberg also avers that M.A.S.S. Services had not purchased a vehicle in Florida at the time of the March 31, 2005 conversation.  Moreover, the Policy does not require the insured to notify the insurer of the acquisition of a new vehicle for Symbol 1 coverage (Posner Dep. at 75), and any failure on the part of Limberg to notify Peerless is accordingly not a concealment of a "material" fact.[17]  In its response to M.A.S.S. Services's motion for summary judgment, Peerless again fails to point to any evidence reflecting Limberg's intent.  Indeed, Peerless states: "Is there clear evidence of misrepresentation by Ms. Limberg for summary judgment purposes?  Probably not.  However, Montgomery does not believe this court has to even reach that analysis."  (Dkt. 84 at 8).[18]  Peerless has not met its burden to go "beyond the pleadings

_____

[17] During oral argument, Peerless maintained that it could have unilaterally changed the Policy if it had known of the existence of the Florida vehicle.  Peerless has provided no legal authority for such a contention.  Indeed, that contention is contrary to all established tenets of contract law.  *Ga. Baptist Children's Homes & Family Ministries, Inc. v. Essex Ins. Co.,* 427 S.E.2d 798, 800 (Ga. App. 1993) (modification of insurance policy requires consideration to the insured and unilateral modification by insured is improper)*; cf.* Ga. Code Ann. § 33-24-45(c) (specifying limited situations in which a policy may be canceled with proper notice to insured).

[18] Peerless also makes the wholly speculative statement that: "because of inattention, too much work, sheer carelessness and/or being unfamiliar with internal BB&T requirements, she then made a series of errors."  (Dkt. 50 at 11-12). Peerless also remarks: "Not intending to sound too harsh, [Peerless] does not know if what she had done was due to incompetence, too much work, poor memory, laziness, not knowing BB&T's policy as to binding authority

through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 323-24.

In conclusion, the Court finds that the plain language of the "Concealment, Misrepresentation or Fraud" clause does not apply to the conduct of Limberg, as an insurance agent. Even if it did, Peerless has failed to identify *any* evidence indicating that fraud or intentional misrepresentation or concealment took place. M.A.S.S. Services's motion for summary judgment is therefore granted as to Count III.[19]

### C.    Umbrella Policy

In Count IV, Peerless contends that the Umbrella Policy does not provide coverage because there is no underlying policy that provides coverage. However, as discussed, the Business Auto Policy provides coverage for the Florida vehicle. The Court also finds that the Auto-Owners Policy provides underlying insurance, even though Peerless did not act on the "Accord Policy Change Requests" until after the June 7, 2005 accident.

The Umbrella Policy provides the general terms of its coverage in Section I - Coverage:

**A.   Insuring Agreement**

1.      We will pay on behalf of the insured those sums in excess of the Retained Limit that the insured becomes legally obligated to pay as damages because of Bodily Injury, Property Damage, Personal Injury or Advertising Injury to which this insurance applies.

The Umbrella Policy provides in Section IV - Conditions:

**I.   Loss Payable**

---

for a [Peerless] insurance product, or a desire not to invest too much time into a project . . . ." (Dkt. 50 at 2). Counsel's unsupported assertions are inappropriate, and in any event, do not suggest intentional conduct on the part of Limberg. If Peerless's statements were accepted as true, they may, at most, amount to negligent behavior.

[19] Peerless represented at oral argument that it did not move for summary judgment as to Count III.

We shall be liable for payment under this policy only after the applicable amount of the **Retained Limit** has been paid by the insured or **Underlying Insurers**.

The Umbrella Policy also provides in Section IV:

**S.   Maintenance of Underlying Insurance**

You agree:

1.      That the **Underlying Insurance** shall remain in force during the Policy Period of this policy;

2.      That the terms, conditions and endorsements of the **Underlying Insurance** will not materially change; and

3.      That the limits of liability as warranted in the Schedule of Underlying Insurance will not change, except for their reduction or exhaustion due to payments for damages that would be covered by this policy.

Your failure to comply with paragraphs 1., 2., or 3. above shall not invalidate this policy.  However, in the event of a loss, we will pay only to the extent that we would have paid had you maintained such **Underlying Insurance**.

Section V.S. defines **Underlying Insurance** as:

the type(s) of insurance afforded under the policies listed in the Schedule of Underlying Insurance of the Declarations and any other insurance available to the insured except insurance specifically purchased to apply in excess of this policy's Limits of Insurance.

Based on the plain language of the definition of "Underlying Insurance," the Auto-Owners policy constitutes "underlying insurance." The policy expressly defines underlying insurance as "*any other insurance available to the insured*" in addition to those listed in the Schedule of Underlying Insurance.[20]   There is no provision specifying that the policies of non-affiliated companies, such as

---

[20] Indeed, it seems likely that "Underlying Insurance" is intended to be broadly defined because Peerless is only liable under the Umbrella Policy for "sums in excess of the Retained Limit," which includes "[t]he total amount of Underlying Insurance applicable to the injury or damage."  (Dkt. 50, Exh. B, Sec. V.Q.).

Auto-Owners, cannot constitute underlying insurance. (Posner Dep. at 84).[21] More importantly, there is no provision in the Policy requiring that underlying insurance be added to the Schedule of Underlying Insurance. *MAG Mut. Ins. Co.*, 367 S.E.2d at 67 (insurer must describe any limitations clearly). Therefore, it is irrelevant whether the Auto-Owners policy was added to the Schedule of Underlying Insurance, in assessing coverage under the plain terms of the Umbrella Policy.

The provisions of the "Maintenance of Underlying Insurance" section, set forth above, do not change this result. Peerless has not alleged that the Auto-Owners policy was not in force during the Policy Period, that the terms, conditions or endorsements of the Auto-Owners policy changed, or that the limits of liability in the Schedule of Underlying Insurance changed. Moreover, this section expressly provides that failure to comply with these provisions "shall not invalidate this policy."

Peerless makes a passing argument regarding language in an "Automobile Liability - Follow Form" Endorsement to the Umbrella policy. (Dkt. 50 at 20). Although the Follow Form Endorsement provides an exclusion from the Umbrella Policy's coverage for injury or damage arising out of the ownership, maintenance, use, leasing, rental or entrustment to others of any "auto," Peerless does not contend that this exclusion applies. (Dkt. 50, Exh. S). Rather, Peerless argues that the Follow Form's reference to "scheduled underlying insurance" -- rather than the broader term "Underlying Insurance" -- means that the Umbrella Policy only provides coverage over a valid Peerless policy. However, as with Peerless's identical reasoning regarding the Georgia Changes Endorsement, this argument is unpersuasive. The language of the Follow Form Endorsement applies

---

[21] Q: Is it fair to say that based upon your review of the [Umbrella] policy, that nothing in it, based just upon a reading of the policy itself, would advise the reader of that internal position of Peerless, that it won't add nonaffiliated companies' policy to its umbrella policy?
A: That is correct. (Posner Dep. at 84).

to the exclusion contained in that endorsement and does not operate to effect a change to the plain language of the Umbrella Policy.

Peerless also argues, as it did with the Business Auto Policy, that BB&T did not have authority to "bind" the Auto-Owners policy. The Binding Authority Memorandum states that "The following lines of business or coverages may not be bound without prior written approval from the company: . . . Personal Umbrella, Commercial Umbrella." (Dkt. 50, Exh. D, at 000439). Another document entitled the "Montgomery Insurance Companies Agent - Company Agreement" specifies that "Agent is also authorized to . . . [b]ind Company on and execute insurance contracts for the lines of insurance Company and Agent are legally permitted to write." (Dkt. 50, Exh. D, Bates No. 000420). However, the Umbrella Policy's effective date was October 1, 2004. This Policy was therefore already in effect when the Auto-Owners policy was bound on February 23, 2005. BB&T's binding authority is therefore irrelevant.[22]

Finally, Peerless contends that the Umbrella Policy could not legally provide coverage for a vehicle that was covered by underlying insurance issued in a state in which Peerless did not have filings. (Dkt. 50 at 4). Peerless provides no legal support for this argument. Moreover, Zink testified that "we would be legally permitted to insure our umbrella and cover over another non-affiliated company's underlying coverage in Florida. Yes, I believe we could." (Zink Dep. at 152; Posner Dep. at 113-14).

Accordingly, the Umbrella Policy applies over both the Business Auto Policy and the Auto-

---

[22] Peerless cites no legal authority for its proposition that an addition of underlying insurance to an umbrella policy involves a binder of coverage. Zink also testified in his deposition that "It's not even a matter of binding authority. If she believed that our umbrella would apply, coverage would be automatic. She wouldn't even have to bind that." (Zink Dep. at 145).

Owners Policy.  M.A.S.S. Services's motion for summary judgment is granted as to Count IV, and Peerless's motion is denied as to Count IV.

*Conclusion*

The conclusion reached herein is dictated by well-established Georgia law relating to construction of insurance policies and the circumstances under which equity may be called upon to grant relief.  Based on the foregoing, it is **ORDERED AND ADJUDGED**:

1)    Plaintiff Peerless Insurance Company's Motion for Summary Judgment (Dkt. 50) is **DENIED**.

2)     Defendant M.A.S.S. Services, Inc.'s Motion for Summary Judgment (Dkt. 72) is **GRANTED**.

3)    All pending motions are **DENIED** as moot.

4)    The Clerk is directed enter judgment in favor of Defendants and to close the case.

**DONE AND ORDERED** in chambers this 5th day of October, 2007.

/s/James D. Whittemore
**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
Counsel of Record

28